**Charles BOIVIN, et al., Plaintiffs,**

v.

**US AIRWAYS, INC., et al., Defendants.**

**No. CIV.A. 03–2373(JR).**

United States District Court, District of Columbia.

Dec. 19, 2003.

---

Susan E. Birenbaum, Asst. Gen. Counsel, PBGC, Joseph R. House, James Armbruster, Asst. Gen. Counsel, William G. Beyer, Deputy Gen. Counsel, PBGC, James J. Keightley, Gen. Counsel, PBGC (Raymond Charles Fay, Bell, Boyd & Lloyd, of Counsel), Washington, DC, for defendant Pension Benefit Guaranty Corp.

Janet Louise Dhillon, Skadden, Arps Slate, Meagher & Flom LLP, Washington, DC, for defendants US Airways Pilots Disability Income Plan and US Airways, Inc.

Sherwin S. Kaplan, Thelen, Reid & Priest, LLP, Washington, DC, for plaintiffs.

### MEMORANDUM ORDER

ROBERTSON, District Judge.

The plaintiffs in this case are retired U.S. Airways pilots and, with the exception of plaintiffs Michael Oakey and Thomas Davis,[1] are participants in U.S. Airways' Pilots' Retirement Income Plan (the "Plan"). They seek to compel the Pension Benefit Guaranty Corporation ("PBGC") to

> enjoin[ PBGC] from paying less than legally required amounts to participants [in the Plan] and compel[ ] it to immediately commence monthly payments at a level which is the greater of the statutory guaranteed maximum or 90% of the pre-termination benefit except in the case of retirees who received a pre-termination benefit less than the statutory guaranteed maximum[, to whom] PBGC should immediately commence payment of the full pre-termination monthly benefit[;] compel PBGC to make initial benefit determinations within two years of the termination of the plan, March 31, 2005[;] order U.S. Airways and PBGC to immediately provide them with the calculations, guidelines, procedures and interpretations applied in determining plaintiffs' current benefit payments[; and] order U.S. Airways to fully cooperate with PBGC in its efforts to make initial benefit determinations.

Plaintiffs' Application for a Temporary Restraining Order, at 1–2, *incorporated by reference in* Plaintiffs' Motion for Preliminary Injunction, at 1. For the reasons stated below, plaintiffs' motion for preliminary injunction [# 3] is **denied**.

### Background

On August 11, 2002, U.S. Airways Group, Inc., and seven subsidiaries ("US Airways"), filed voluntary petitions for Chapter 11 reorganization in the Bankruptcy Court of the Eastern District of Virginia. US Airways "aggressively pursued a 'fast track' reorganization, with the announced goal of being out of chapter 11 by the end of the first-quarter, 2003." *In re U.S. Airways Group, Inc.*, 296 B.R. 734, 739–40 (Bankr.E.D.Va.2003) ("Bankr.Court Decision"). It soon became apparent that

---

1. The plaintiffs' application for a preliminary injunction seeks relief with respect only to U.S. Airways' Pilots' Retirement Income Plan, and not with respect to U.S. Airways' Pilots' Disability Income Plan (a named defendant in the plaintiffs' action on the merits). Plaintiffs Oakey and Davis are participants in the latter plan and, accordingly, are not governed by this decision.

U.S. Airways' seven-year reorganization plan would create "a serious funding shortfall for [US Airways'] defined benefit pension plan." *Id.* at 740–41. On January 30, 2003, U.S. Airways notified PBGC of its intent to "distress" terminate its underfunded "defined benefits" plan—the Pilots' Retirement Income Plan. That same day, U.S. Airways moved in Bankruptcy Court for judicial findings, as required by ERISA § 4041(c)(2)(B)(ii)(IV)[2], to permit a distress termination of the Plan.

On March 2, 2003, the Bankruptcy Court found that U.S. Airways had satisfied the requirements for a distress termination: "Unless the Plan is terminated, the debtors will be unable to pay all of their debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process." *In re U.S. Airways Group, Inc.*, No. 02–83984 (Bankr.E.D.V.A. Mar. 2, 2003), at 1. Because the Plan had been established pursuant to a collective bargaining agreement between U.S. Airways and the Airline Pilots Association ("ALPA"), however, the Bankruptcy Court's order terminating the Plan was conditioned upon the union's consent. US Airways and ALPA subsequently reached agreement, and, on March 28, 2003, U.S. Airways entered into an agreement with PBGC establishing March 31, 2003 as the date of the Plan's termination.

When a "defined benefits" plan is to be terminated as the U.S. Airways Plan was terminated here, by "distress termination," 29 U.S.C. § 1341(c), PBGC and the pretermination plan administrator, in this case U.S. Airways, have certain responsibilities to plan participants and beneficiaries. *See, e.g., id.*

It was U.S. Airways' pre-termination responsibility to revise benefit payments under the Plan from then-current levels to what it estimated would be the amount of benefits that would covered by plan assets or guaranteed by PBGC following termination. *See* 29 U.S.C. § 1341(c)(3)(D)(ii)(IV); 29 C.F.R. § 4041.42(c). Revised benefit calculations are governed by ERISA and PBGC regulations, and depend in part on estimates of the assets of the Plan and the order in which they will be allocated to participants. *See* 29 U.S.C. §§ 1344(a)(1)-(6). US Airways' pre-termination calculations were—and were intended to be—estimates, *see* 29 C.F.R. §§ 4022.61–63. The parties agree that PBGC has the duty of making the formal determination of each Plan participant's post-termination benefits. *See* 29 C.F.R. §§ 4003.1 *et seq.*

Plan participants were informed by U.S. Airways of the pending termination and of their estimated post-termination benefits by letters dated March 28, 2003:

Pursuant to PBGC requirements, your benefit under the Pension Plan will be reduced to the maximum amount payable by the PBGC. In general, for pilots who retired or pilots who could have retired before April 1, 2000, the pension benefit adjustment is estimated to be 85% of the April 1, 2000 benefit (based on plan provisions in effect on April 1, 1998). However, if the adjusted pension benefit is below the prescribed PBGC maximum benefit (adjusted for

---

**2.** This section is codified at 29 U.S.C. § 1341(c)(2)(B)(ii)(IV), and provides:

Distress termination of single-employer plans[:] ... A single-employer plan may terminate under a distress termination ... [if] the bankruptcy court (or such other appropriate court) determines that, unless the plan is terminated, such person will be unable to pay all its debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process and approves the termination.

29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

age and optional form of payment), the amount payable is increased to the lesser of the PBGC maximum or the current March 1, 2003 benefit. For pilots who were not eligible to retire before April 1, 2000, the retirement benefit is the lesser of the PBGC maximum (adjusted for age and optional form of payment) or the current March 1, 2003 benefit amount. If a partial lump sum payment was taken at retirement, the calculations described above are first done as if no partial lump sum was paid at retirement. The remaining benefit is reduced by the annuity value of the lump sum previously received.

Letter from U.S. Airways, dated March 28, 2003, Compl., Ex. C.

PBGC, a United States government corporation, *see* 29 U.S.C. § 1302, has the primary responsibility of guaranteeing benefits, up to statutory limits, of private-sector defined benefit pension plans.[3] *See PBGC v. LTV Corp.*, 496 U.S. 633, 637, 110 S.Ct. 2668, 110 L.Ed.2d 579 (1990). The Supreme Court has described the PBGC's limited role as guarantor of plan benefits in these terms:

> When a plan covered under Title IV terminates with insufficient assets to satisfy its pension obligations to the employees, ... [t]he PBGC ... must add its own funds to ensure payment of most of the remaining "nonforfeitable" benefits, i.e., those benefits to which participants have earned entitlement under the plan terms as of the date of termination. ERISA does place limits on the benefits PBGC may guarantee upon plan termi-

nation, however, even if an employee is entitled to greater benefits under the terms of the plan.

*LTV Corp.*, 496 U.S. at 637–38, 110 S.Ct. 2668 (internal citations omitted).

Another responsibility of PBGC is to review the financial condition of a plan to determine whether its assets are sufficient, when allocated according to the priorities set out in the statute, 29 U.S.C. § 1344, to discharge its duty to pay guaranteeable benefits. *See Piech v. PBGC*, 744 F.2d 156, 158 (D.C.Cir.1984). If PBGC cannot make this determination, it "must request the appointment of itself or a third party to act as trustee." *Id.* (citing 29 U.S.C. § 1342(b)). Although PBGC is not required to apply to be appointed the trustee of terminated plans, 29 U.S.C. § 1342(b), it usually does apply, and the appropriate United States district or bankruptcy court "invariably" grants its application. *See In re Interstate Cigar Co.*, 150 B.R. 305, 307 (Bankr.E.D.N.Y.1993). This Plan was no exception, and PBGC, at its own request, was appointed trustee of the Plan.

When the U.S. Airways' Plan was terminated on March 31, 2003, PBGC immediately began paying the estimated benefits that U.S. Airways had calculated and announced pre-termination. PBGC has not yet made its formal determination of each participant's post-termination benefits. It is undisputed that the usual time for PBGC to issue these formal benefit determinations to all participants is two to three years after PBGC takes over a plan.

---

**3.** It is because PBGC is an insurer of guaranteed benefits, that the statute governing "distress terminations" requires a showing to a bankruptcy court of inability to pay all debts under a plan of reorganization unless a plan is terminated:

> to limit 'to cases of severe business hardship' the ability of plan sponsors to termi-

nate their pension plans and thereby shift liability for guaranteed benefits onto other insurance premium payers in the PBGC program.

Bankr.Court Decision, at 15–16 (quoting *In re Wire Rope Corp. of Am., Inc.*, 287 B.R. 771, 777 (Bankr.W.D.Mo.2002)).

The primary complaint of these plaintiffs is that the estimated benefit calculations are incorrectly low as to them, and that waiting two to three years for a formal benefit determination would cause them great hardship. In describing the miscalculations, plaintiffs divide themselves into four categories according to the type of calculation error alleged:

1. elderly participants (approximately 230 participants who are in their seventies and eighties) who had their benefits reduced by 15 percent, but who, because of their age, were guaranteed benefits above the amounts they were receiving pre-termination and who, accordingly, should not have had their benefits reduced at all, see Tr. of Proceedings before Judge James Robertson, Dec. 5, 2003, at 9–13;

2. participants who elected to take lump-sum payments upon retirement and who assert that the lump-sum amount was improperly considered as part of the annuity they were receiving as of the date of termination of the plan in calculating their benefits, instead of considering only their actual annuity, see id., at 13–15;

3. participants who fit within priority category three, see 29 U.S.C. § 1344(a)(3), and who assert that their estimated benefits are based upon a mis-calculation that the Plan was only 85 percent fully funded, when it appears that the Plan is fully funded at a much higher percentage, see id., at 15–16; and

4. participants who had their benefits calculated based on their actual ages at the time of termination, but who have been certified by the Social Security Administration as permanently and totally disabled, and who should have been treated as though they were 65 at the time of the Plan's termination (Michael Oakey is the only known participant[4]), see id., at 17.

## Analysis

To prevail on their motion for a preliminary injunction, the plaintiffs must demonstrate that (1) there is a substantial likelihood that they will succeed on the merits; (2) they will be irreparably harmed if an injunction is not granted; (3) an injunction will not cause substantial harm to the other party; and (4) the injunction will further the public interest.[5]

**4.** Although plaintiff Oakey may have a claim for breach of fiduciary duty against PBGC with respect to its failure to correct a possible mistake in his estimated benefits, as discussed, infra, Oakey is not a participant in the Plan that is the subject of plaintiffs' motion for preliminary injunction.

**5.** Because the plaintiffs seek an injunction ordering a party to take an action rather than prohibiting a party from taking further action, the injunction plaintiffs seek is a mandatory injunction. See Meghrig v. KFC Western, Inc., 516 U.S. 479, 484, 116 S.Ct. 1251, 134 L.Ed.2d 121 (1996). Some D.C. District Courts have held that mandatory injunctions require applicants to "meet a higher standard than in the ordinary case by showing clearly that he or she is entitled to relief or that

extreme or very dangerous damage will result from the denial of the injunction." Bancoult v. McNamara, 227 F.Supp.2d 144, 151 (D.D.C.2002) (quoting Veitch v. Danzig, 135 F.Supp.2d 32, 35 (D.D.C.2001) (internal quotation marks omitted)). It appears, however, that the D.C. Circuit has not yet adopted this rule. See Friends for All Children, Inc. v. Lockheed Aircraft Corp., 746 F.2d 816, 834 n. 31 (D.C.Cir.1984) ("In this circuit, however, no case seems to squarely require a heightened showing, and we express no view as to whether a heightened showing should in fact be required."); Columbia Hosp. for Women Found., Inc. v. Bank of Tokyo–Mitsubishi, Ltd., 159 F.3d 636, at *1 (D.C.Cir.1998) (unpublished table decision) (declining to "reach the question whether the district court erred in holding that the standard applicable to a

*See Davenport v. Int'l Bhd. of Teamsters,* 166 F.3d 356, 360 (D.C.Cir.1999). "These factors interrelate on a sliding scale and must be balanced against each other." *Id.* at 360–61 (citation omitted). "'It frequently is observed that a preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'" *Mazurek v. Armstrong,* 520 U.S. 968, 972, 117 S.Ct. 1865, 138 L.Ed.2d 162 (1997) (*per curiam*) (emphasis in original) (quoting 11A C. Wright, A. Miller, & M. Kane, *Federal Practice and Procedure* § 2948, pp. 129–130 (2d ed.1995)).

*Likelihood of success on the merits*

 The plaintiffs have briefed their likelihood of success as to several of their claims against both PBGC and U.S. Airways,[6] but the only claim that underlies their preliminary injunction motion is that PBGC breached its fiduciary duties by failing to correct the mistakes they have identified in the calculation of plaintiffs' estimated benefits. *See* Tr. of Proceedings before Judge James Robertson, Dec. 5, 2003, at 18 ("[We, the plaintiffs, are] talking about the pure act of administering the plan on an interim basis, which is by statute, the responsibility is given to the ... trustee, an ERISA fiduciary."). Similarly, only one of PBGC's four theories for finding that the plaintiffs are not likely to succeed on the merits of their claims—that a claim for breach of fiduciary duty may not be maintained against PBGC for its role in making formal benefit determinations—is central to this motion.[7] This is because plaintiffs concede that their motion is premature unless the Court finds that PBGC has fiduciary duty to correct mistakes in estimated benefits prior to making a formal benefit determination.[8] *See* 29 C.F.R. § 4003.7.

The central issue relating to the merits of plaintiffs' claim is whether PBGC has a fiduciary duty to correct mistakes made by U.S. Airways in calculating estimated benefits before it has fully processed the ter-

---

mandatory preliminary injunction is higher than that applicable to a prohibitory preliminary injunction ..."). My own view on this issue is unimportant because, for the reasons discussed below, I do not find that the plaintiffs are entitled to a preliminary injunction even under a non-heightened standard.

6. Specifically, the plaintiffs have briefed the court on their claims that PBGC breached its obligation to guarantee benefits; PBGC breached its fiduciary duties; US Airways breached its fiduciary duties; and PBGC is liable as a co-fiduciary for the breach of U.S. Airways. Not addressed by this opinion in any manner are plaintiffs additional claims, raised only in their complaint, that U.S. Airways and PBGC failed to provide plan documents and failed to provide benefits to plaintiff Oakley. Plaintiffs' complaint seeks class action relief as to all claims on behalf of (a) all participants and beneficiaries of the Plan whose benefits have been miscalculated, and (b) all participants and beneficiaries who did not receive statutorily required summary plan descriptions, summary of material modifications or plan documents.

7. The other three theories are: (1) there has been no final agency action; (2) the plaintiffs have failed to exhaust their administrative remedies; and (3) any claim for breach of fiduciary duty is premature. *See* Mem. of PBGC in Opp. to Pls.'s Motion for Preliminary Injunction ("PBGC's Opposition"), at 22–27.

8. Although "ERISA itself does not specifically require the exhaustion of remedies available under pension plans", as a matter of judicial discretion, "barring exceptional circumstances, plaintiffs seeking a determination pursuant to ERISA of rights under their pension plans 'must ... exhaust available administrative remedies under their ERISA-governed plans before they may bring suit in federal court.'" *Communications Workers of Am. v. Am. Tel. & Tel. Co.,* 40 F.3d 426, 431–32 (D.C.Cir.1994) (citation omitted).

minated plan and made formal benefit determinations. Plaintiffs submit that PBGC does have such a duty in its capacity as trustee that is separate from its duty as guarantor; PBGC responds that its role as trustee is essentially ministerial and that, "in determining plaintiffs' Title IV benefits, PBGC is acting *solely* in its capacity as statutory guarantor and, as such, has no fiduciary duty." PBGC's Opposition, at 26 (emphasis in original). It is undisputed that PBGC, when acting as guarantor, is not subject to fiduciary duties.

There is case law supporting the proposition that PBGC calculates benefits in its role as *trustee,* and that fiduciary duties apply to these calculations. In particular, a district court recently held in *Al Pineiro v. PBGC* that "when PBGC calculates and pays benefits, it does so as trustee." 2003 WL 22019831 (S.D.N.Y. Aug. 26, 2003). That court further determined that, "when PBGC is appointed a plan's trustee following a decree of termination, it is subject to a fiduciary duty in all actions except those involving [PBGC's function as guarantor]." *Id.*

PBGC, who informs the Court that it has not yet had the opportunity to appeal the *Al Pineiro* decision, argues here that it is incorrect as a matter of law. It appears, however, that *Al Pineiro* is consistent with the law of this Circuit. In *Piech,* the D.C. Circuit implicitly endorsed both the view that PBGC makes benefits calculations in its capacity as trustee, *see Piech,* 744 F.2d at 157 ("The Pension Benefits Guaranty Corporation (PBGC), as trustee of the ... pension plans, determined that none of the plaintiffs was entitled to guaranteed benefits."), and that fiduciary obligations inhere in this trustee role, *see id.* at 161 ("Although we do not suggest that ['the dual role of trustee and guarantor, a role that Congress has specifically authorized for PBGC'] can never give rise to a conflict of interest leading to a breach of the fiduciary obligations of a plan trustee, in this case the PBGC has done nothing inconsistent with its statutory obligations as trustee."). Accordingly, it appears more likely than not that plaintiffs will indeed succeed on the merits of their assertion that PBGC, as trustee of the Plan, has fiduciary duties to Plan participants with respect to their benefits calculations.

Such a ruling would not end the merits inquiry, however. The next steps are to determine whether U.S. Airways' miscalculations of the estimated benefits of the four types of participants described by the plaintiffs (or any of them) actually were incorrect, and, if they were, to determine whether PBGC's failure to correct those miscalculations *ad interim* was a breach of its fiduciary duty.

The arguments PBGC has made to the Court on these additional questions are (1) that the process of benefits calculation is difficult, and (2) that, even if there is a mistake in the estimated benefits, it was made in good faith. This first argument is wasted on the Court, as a government corporation cannot escape its fiduciary duties by claiming that its job is "complex."

The second argument is premised upon a line of cases holding that, in order to state a claim for breach of fiduciary duty in the ERISA context, the breach must be willful or involve bad faith conduct. *See Burke v. Latrobe Steel Co.,* 775 F.2d 88, 91 (3d Cir.1985) ("[A] pensioner does not establish a violation of fiduciary duty simply by showing that the administrator did not follow the terms of the plan. If such an action is undertaken pursuant to a good faith, albeit erroneous, interpretation, ERISA's fiduciary provisions are not violated. To establish liability, willful or bad faith conduct must be proved"); *see also Gramm v. Bell Atl. Mgt. Pension Plan,*

983 F.Supp. 585, 593 (D.N.J.1997) ("[A] mistake in calculating pension benefits does not constitute willful misconduct or bad faith sufficient to support a breach of fiduciary duty claim.").

These plaintiffs are not simply alleging mistaken calculations, however. Their claim is that PBGC has refused timely to correct mistakes after the mistakes have been brought to its attention. PBGC actually concedes, in its supplementary memorandum to the Court, that the estimated benefits calculations with respect to one of plaintiffs four alleged groups of participants, the elderly participants, are in error, but PBGC continues to assert that, until it is ready to issue a formal benefits determination, it will not issue an interim determination that might be mistaken. Up until now, the parties have been arguing about whether PBGC stands in a fiduciary relationship to the plaintiffs at all, and neither side has fully developed the question of what a fiduciary must do when presented with evidence that it has inherited flawed interim benefit calculations. That question, and the question of whether and to what extent the interim benefit calculations were actually incorrect, will doubtless be explored in the next phase of this case. It suffices for now to say that plaintiffs appear to have a likelihood of success on the merits that is considerably greater than zero.

*Irreparable harm*

 "Although the concept of irreparable harm does not readily lend itself to definition, the courts have developed several well known and indisputable principles to guide them in the determination of whether this requirement has been met." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C.Cir.1985). Included among them is the principle that "economic loss does not, in and of itself, constitute irreparable harm." *Id.* As the D.C. Circuit has explained,

> [t]he key word in this consideration is *irreparable*. Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation weighs heavily against a claim of irreparable harm.

*Id.* (emphasis in original) (quoting *Va. Petroleum Jobbers Ass'n v. FPC*, 259 F.2d 921, 925 (D.C.Cir.1958)); *see also, e.g., Veitch,* 135 F.Supp.2d at 36 ("[Plaintiff's] claims of irreparable harm are predominantly those of loss of salary and benefits ... [which are] injuries ... typical in instances of the termination of any government employee, which the Supreme Court found insufficient to show irreparable injury ...."). The Court does not doubt that the reduction of plaintiffs' benefits has caused them financial hardship, particularly in light of the fact that the plaintiffs are all retirees.[9] But the injuries documented

---

9. In fact, the Bankruptcy Court, in deciding to enter the factual findings necessary to terminate the plan, explicitly acknowledged that hardships on plan participants must be understood in light of the alternatives to termination, explaining:

> [I]t is obvious that many individuals will indeed suffer great financial hardship [from termination of the Plan]. But the question always remains: what is the alternative? If the debtors are unable to reorganize and

must liquidate in chapter 7, the pension plan would be terminated anyway, and the retired pilots would be in exactly the same position, as regards their pension, as they will under the proposed distress termination. The position of the active pilots would be significantly worse under a liquidation, because they would also lose their current employment and whatever benefits might accrue under a follow-on plan. Given that reality, the undoubted financial

on this record—the forced sale of a house, a boat or stock, or losses due to market declines and U.S. Airways' stoppage of paying health insurance premiums—do not rise to the level of "irreparable" harm necessary to warrant the extraordinary remedy of a preliminary injunction. If a participant's estimated benefit is ultimately determined to be less than the formal benefit determination, that participant will receive a lump sum reimbursement, with interest, from PBGC for the underpayment. *See* 29 C.F.R. §§ 4022.81(b), (c), 4022.83.[10]

*The public interest and harm to the parties*

The parties' arguments as to these two factors do not tip the scale in either direction. PBGC argues that the public interest would be ill served if this court were to grant the preliminary injunction because it would "disrupt the PBGC's orderly processing of benefits under terminated plans, would create an unworkable precedent, . . . would impose an undue burden on the agency," and would force PBGC "to shift resources away from other plans for which it is responsible, thereby delaying the processing of benefits in those plans." PBGC's Opposition, at 20–21. Plaintiffs respond to both arguments by saying that it doesn't harm PBGC, or the public for that matter, to require PBGC to comply with its statutory duties to correctly calculate plan benefits. Neither side's arguments are particularly compelling in the

absence of a developed record that would permit an assessment of the impact on PBGC of an order requiring it to comply with plaintiffs' demand.

\* \* \* \* \* \*

Because the plaintiffs' showing of likelihood of success on the merits must be factored together with their failure to demonstrate "irreparable" harm, plaintiffs' motion for preliminary injunction [# 3] is **denied**. The parties are directed to meet and confer on a process, and a timetable, for the presentation of this matter on the merits upon a fully developed record. If they can reach agreement, they are to present an agreed scheduling order for approval. If they cannot, a status/scheduling conference will be held on **January 8, 2004, at 4:00 p.m.**

---

hardship that will result from a termination of the plan is an insufficient basis for this court to withhold its approval when the debtors have made a compelling showing that termination is necessary for this airline to emerge from chapter 11. Bankr.Court Decision, at 21.

10. The burden, and therefore the need to avoid, recoupment of overpaid benefits was specifically taken into consideration by Congress when it adopted the statutory rules governing "estimated" benefits. *See* H.R.Rep.

No. 99–300, at 299, *reprinted in* 1986 U.S.C.C.A.N. 756, 950 ("The Committee recognizes that recoupment of benefit overpayments can result in hardship to participants . . . . Accordingly under the bill, . . . [a]s of the proposed termination date, the plan administrator is required to limit the payment of benefits to estimated guaranteed benefits plus the estimated level of nonguaranteed benefits to which assets are allocated under [29 U.S.C. § 1344].").