# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

---

Argued March 14, 2006          Decided May 2, 2006

No. 05-5165

CHARLES BOIVIN, ET AL.,
APPELLANTS

v.

U.S. AIRWAYS, INC., ET AL.,
APPELLEES

---

Appeal from the United States District Court
for the District of Columbia
(No. 03cv02373jr)

---

*Sara R. Pikofsky* argued the cause for appellants. With her on the briefs was *Sherwin Kaplan*.

*Garth D. Wilson*, Attorney, Pension Benefit Guaranty Corporation (PBGC), argued the cause for appellee PBGC. With him on the brief were *Jeffrey B. Cohen*, Chief Counsel, *Nancy S. Heermans*, Associate Chief Counsel, *Paula J. Connelly*, Assistant Chief Counsel, and *Beth A. Bangert, Jean Marie Breen*, and *Sandra A. Garrick*, Attorneys.

Before:  HENDERSON and GARLAND, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Circuit Judge* GARLAND.

GARLAND, *Circuit Judge*:   Retired U.S. Airways pilots brought suit against the Pension Benefit Guaranty Corporation ("PBGC" or "Corporation"), seeking to compel the PBGC to correct alleged errors in its calculation of estimated benefits due the pilots under the Employee Retirement Income Security Act of 1974 ("ERISA") and the U.S. Airways' Pilots' Retirement Income Plan.  The pilots contend that, in failing to correct those errors, the PBGC breached its obligations both as fiduciary and as agency-guarantor.  Without reaching the merits, we conclude that the claims against the PBGC must be dismissed because the pilots have not yet exhausted their administrative remedies.

I

On August 11, 2002, U.S. Airways Group, Inc. and seven subsidiaries (collectively, "U.S. Airways") filed voluntary petitions in the Bankruptcy Court for the Eastern District of Virginia, seeking reorganization relief under Chapter 11 of the Bankruptcy Code, 11 U.S.C. § 1101, *et seq*.  On January 30, 2003, U.S. Airways filed with the PBGC a notice of its intent to terminate its Pilots' Retirement Income Plan, a defined-benefit pension plan, citing "a serious funding shortfall."  *In re U.S. Airways Group, Inc*., 296 B.R. 734, 738 (Bankr. E.D. Va. 2003).  U.S. Airways simultaneously filed a motion in the bankruptcy court for the judicial findings required by ERISA to permit a distress termination of the Plan.   *See* 29 U.S.C. § 1341(c)(2)(B)(ii)(IV).

The bankruptcy court subsequently granted the motion, finding that "unless the Plan is terminated, the debtors will be

unable to pay all of their debts pursuant to a plan of reorganization and will be unable to continue in business outside the chapter 11 reorganization process." *In re U.S. Airways Group, Inc.*, No. 02-83984, Order at 1 (Bankr. E.D. Va. Mar. 2, 2003) (citing 29 U.S.C. § 1341(c)(2)(B)(ii)(IV)). After U.S. Airways gained the consent of the pilots' union to terminate the Plan, *see* 29 U.S.C. § 1341(a)(3), the company entered into an agreement with the PBGC setting March 31, 2003 as the Plan's termination date.

Prior to the termination date, U.S. Airways, as the pre-termination plan administrator, was responsible for revising benefit payments under the Plan from then-current levels to what it estimated would be the amount of benefits that would be covered by Plan assets or guaranteed by the PBGC following termination. *See* 29 U.S.C. § 1341(c)(3)(D)(ii)(IV); 29 C.F.R. § 4041.42(c). Revised benefit calculations are governed by ERISA and PBGC regulations. *See* 29 U.S.C. §§ 1322, 1344(a); 29 C.F.R. § 4022.61-.63. U.S. Airways completed these determinations and informed Plan participants of their estimated post-termination benefits by letters dated March 28, 2003. *See Boivin v. U.S. Airways, Inc.*, 297 F. Supp. 2d 110, 113 (D.D.C. 2003).

The PBGC -- created pursuant to Title IV of ERISA -- is a U.S. government corporation within the Department of Labor that insures private-sector defined-benefit pension plans. *See* 29 U.S.C. § 1302. Sponsors of such plans pay premiums to the PBGC, and the Corporation acts as a statutory guarantor, paying benefits to participants of underfunded terminated plans subject to statutory limits. *See id.* §§ 1307, 1322. When an underfunded plan is terminated, a successor trustee is appointed to administer the plan and to assume responsibility for its assets. ERISA permits, but does not require, the PBGC to be appointed as the successor trustee. *See id.* § 1342(b). In practice, the

PBGC has always applied to serve as successor trustee for distress-terminated defined-benefit plans, and the courts have invariably granted its applications. *See Pineiro v. PBGC*, 318 F. Supp. 2d 67, 72 (S.D.N.Y. 2003). Following this well-worn path, the PBGC applied to serve as successor trustee of the U.S. Airways Plan, and its application was granted.

When the U.S. Airways Plan terminated on March 31, 2003, the PBGC began paying estimated benefits. At that point, the PBGC had not yet made its formal determination of each participant's post-termination benefits, and it still has not done so. The parties do not dispute that the PBGC normally requires two to three years from the date it takes over a plan to issue a formal benefit determination to each plan participant. *See Boivin*, 297 F. Supp. 2d at 114; Decl. of Candace Campbell ¶ 15 (Nov. 24, 2003). Once final benefit determinations are made, the PBGC either repays any shortfall in the amount of the participants' interim benefits, with interest, or seeks to recoup any surplus. *See* 29 C.F.R. § 4022.81-.83.

On November 17, 2003, without waiting for the PBGC to complete its final determinations, the plaintiffs filed suit against the PBGC and U.S. Airways. The gravamen of their complaint was that "the estimated benefit calculations [were] incorrectly low as to them, and that waiting two to three years for a formal benefit determination would cause them great hardship." *Boivin*, 297 F. Supp. 2d at 115. They alleged four primary errors in the calculation of estimated benefits: (1) incorrect determination of the effective date of an amendment to the U.S. Airways Plan concerning early retirees; (2) improper consideration of previously paid partial lump-sum benefits in calculating prospective monthly annuities; (3) underpayment of benefits to retirees over the age of 65, based upon the PBGC's statutory guaranty levels; and (4) underpayment of benefits to other retirees, based on the "PBGC's application of an

artificially low funding percentage in calculating benefits," Appellants' Br. 2. The plaintiffs contended that the PBGC breached its duties, both as a fiduciary and as a federal agency-guarantor, by failing to correct the asserted errors in its calculation of estimated benefits. *See* Am. Compl. ¶¶ 81-89.

The plaintiffs' claims against U.S. Airways were stayed as a consequence of the airline's bankruptcy filing. *See* 11 U.S.C. § 362(a); *Boivin v. U.S. Airways, Inc.*, No. 03-2373, Order at 1 (D.D.C. March 17, 2005). On December 19, 2003, the district court denied a motion for a preliminary injunction against the PBGC. In the months that followed, the PBGC took action to remedy two of the four errors alleged by the pilots. First, it corrected the benefit payments for retirees over the age of 65 by increasing their benefits from 85 to 100 percent of their pre-termination levels. Second, it corrected payments for other retirees by raising their benefits from 85 to 98 percent of their pre-termination levels. The PBGC took no action as to the other two alleged errors.

On March 17, 2005, after hearing motions filed by both sides, the district court issued an order granting summary judgment for the PBGC on the plaintiffs' fiduciary duty claims, holding that there was no evidence that the Corporation had breached any fiduciary obligation in calculating estimated benefits. *See Boivin v. U.S. Airways, Inc*., No. 03-2373, Mem. Op. at 3-4 (D.D.C. Mar. 17, 2005). It dismissed for failure to state a claim the plaintiffs' allegations against the PBGC as agency-guarantor, on the ground that the plaintiffs had failed to exhaust their administrative remedies. *Id*. at 4-5. At the plaintiffs' request, the court then entered final judgment pursuant to Federal Rule of Civil Procedure 54(b).

6

II

As noted above, the pilots' complaint alleged that the PBGC had committed four errors in calculating their estimated benefits. The pilots agree that the PBGC has since corrected two of those errors -- relating to the percentage of payments made to retirees -- and that only two alleged errors remain for our consideration on this appeal: (1) incorrect determination of the effective date of an amendment to the U.S. Airways Plan concerning early retirees; and (2) improper consideration of previously paid partial lump-sum benefits in calculating prospective monthly annuities. *See* Appellants' Br. 2, 5-7; Reply Br. 19.

The first remaining allegation concerns benefit reductions made by the PBGC based on its view that an amendment to the Plan, which enhanced benefits for certain early retirees, had become effective less than 60 months before the Plan terminated. ERISA provides that amendments "resulting from a plan amendment which was made, or became effective, whichever is later," less than 60 months before termination may not be fully credited. 29 U.S.C. § 1322(b)(1)(B).[1] The parties

---

[1]ERISA § 4022(b)(1) states:

Except to the extent provided in paragraph 7,

. . . .

(B) any increase in the amount of benefits under a plan resulting from a plan amendment which was made, or became effective, whichever is later, within the 60 months before the date on which the plan terminates shall be disregarded.

29 U.S.C. § 1322(b)(1). The referenced exception, ERISA § 4022(b)(7), provides:

Benefits described in paragraph (1) are guaranteed only to

appear to agree that the amendment at issue here was "made" on December 4, 1997, the date it was adopted. *See* Appellants' Br. 30; PBGC's Opp'n to Pl.'s Supplemental Mem. in Supp. of its Mot. for Partial Summ. J. at 5. The dispute, therefore, is over when the amendment "became effective."

The plaintiffs contend that, because correspondence setting forth the amendment stated that U.S. Airways would offer the enhancement "effective as of the effective date of the new Collective Bargaining Agreement" with the pilots' union, Early Retirement Incentive Program, J.A. at 107, and because the Agreement became effective on January 1, 1998, that date is the operative date. They further contend that, because January 1, 1998 was more than 60 months before the Plan was terminated, no reduction in benefits is appropriate. The PBGC, by contrast, has preliminarily concluded that the amendment did not become effective until May 1, 1998 -- less than 60 months before termination -- because that was the date specified in the correspondence as the first date upon which a participant could retire and receive the enhanced benefit. *See id*. at 107-08. The plaintiffs argue that the PBGC's position misconstrues the statutory phrase "became effective," 29 U.S.C. § 1322(b)(1), as

---

the extent of the greater of --

> (A) 20 percent of the amount which, but for the fact that the plan or amendment has not been in effect for 60 months or more, would be guaranteed under this section, or

> (B) $20 per month,

multiplied by the number of years (but not more than 5) the amendment . . . has been in effect.

*Id*. § 1322(b)(7).

well as the related regulatory phrase "has been in effect," 29 C.F.R. § 4022.25(b).[2]

The second alleged error concerns pilots who, prior to the Plan's termination, had taken a portion of their pension benefits as a lump sum, with the remainder to be paid out in monthly installments. The PBGC treated the partial lump sum as if it amounted to the purchase of a partial annuity, also to be paid out prospectively. The PBGC then applied the statutory guarantee limit against the total payments to the participant, including the portion taken as a lump sum.[3] In so doing, the plaintiffs allege, the PBGC misinterpreted its own regulations by making calculations on the basis of benefits "paid" rather than benefits "payable" as of the termination date. *See* 29 C.F.R. § 4022.22 (referring to "benefits payable"); *id*. § 4022.62 (same).

As this discussion indicates, both errors alleged by the pilots depend, at bottom, upon interpretations of ERISA sections and PBGC regulations. The pilots assert that the PBGC misinterpreted the relevant statutory and regulatory provisions, and in so doing breached both its fiduciary duty as trustee and its responsibility as agency-guarantor. *See* Appellants' Br. 8 (citing 29 U.S.C. §§ 1132, 1303(f)). The PBGC responds in

---

[2]*See* 29 C.F.R. § 4022.25(b) (providing that the percentage of a "benefit increase" guaranteed by the PBGC is determined, inter alia, by multiplying twenty percent by the number of years (not to exceed five) that "the benefit increase has been in effect").

[3]If the participant's total payments were greater than the applicable guarantee limit, the PBGC reduced the remainder annuity to zero because, in its view, the retiree had already received more than he was due by virtue of the partial lump sum "annuity." *See* Mem. in Supp. of the PBGC's Cross-Mot. for Summ. J. at 29.

three ways. First, it argues that, in calculating estimated benefits, it owes no fiduciary duty to the pilots because it makes such calculations in its role as agency-guarantor and not as a fiduciary. Second, the PBGC asserts that -- even if it did act as a fiduciary in making the challenged calculations (and even if the calculations were wrong) -- it did not breach a duty to the pilots because it made the calculations in good faith. Third, the PBGC maintains that, regardless of the capacity in which it acted and regardless of whether its calculations violated a fiduciary duty or agency responsibility, the pilots have not exhausted their administrative remedies and must do so before seeking judicial review. That administrative process requires the plaintiffs to wait until the PBGC completes its work and issues formal benefit determinations, at which point the plaintiffs must complete internal PBGC appeals before filing an action in federal court.

For the reasons set forth below, we agree with the PBGC's exhaustion argument. The pilots must await formal determinations, and then challenge those determinations through the procedures that the PBGC has provided, before they may seek redress in court. Since our holding regarding exhaustion resolves the case, we need not reach any questions concerning the existence or scope of the PBGC's fiduciary duty.

## III

Although ERISA does not expressly require exhaustion of administrative remedies,[4] "where Congress has not clearly required exhaustion, sound judicial discretion governs."

---

[4]Nor does it expressly condition judicial review upon "final" agency action. The two ERISA provisions that the plaintiffs assert authorize their suit are 29 U.S.C. §§ 1132(a) and 1303(f); the plaintiffs do not rely on the Administrative Procedure Act, 5 U.S.C. § 704.

*McCarthy v. Madigan*, 503 U.S. 140, 144 (1992); *see Communications Workers of Am. v. AT&T*, 40 F.3d 426, 432 (D.C. Cir. 1994). And as the plaintiffs correctly concede, "[c]ourts generally hesitate to interfere in matters prior to final agency action in order to allow the expert agency to complete its work and to allow senior officials to authoritatively rule on issues." Appellants' Br. 34.[5] Indeed, this court has held that, in the case of ongoing pension plans, "barring exceptional circumstances, parties aggrieved by decisions of pension plan administrators must exhaust the administrative remedies available to them under their pension plans before challenging those decisions in court" under ERISA. *Communications Workers*, 40 F.3d at 428.

1. The PBGC has promulgated regulations providing administrative remedies for persons dissatisfied with its benefit determinations. As discussed in Part I, when an underfunded plan terminates, the PBGC begins paying estimated benefits to plan participants. After completing a review of plan documents, data, and assets, the Corporation issues benefit determination letters to participants setting forth its formal calculation of their benefits. The regulations refer to such a formal determination as an "initial determination," and they require that it "shall be in writing, shall state the reason for the determination, and . . . shall contain notice of the right to request review of the determination." 29 C.F.R. § 4003.21. "Any person aggrieved by" such "an initial determination" may file an appeal to the

---

[5]*See McCarthy*, 503 U.S. at 144-45 ("This Court long has acknowledged the general rule that parties exhaust prescribed administrative remedies before seeking relief from the federal courts."); *Myers v. Bethlehem Shipbldg. Corp.*, 303 U.S. 41, 50-51 (1938) (noting "the long-settled rule of judicial administration that no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted").

PBGC Appeals Board. *See id.* § 4003.51.[6] The decision of the Appeals Board "constitutes the final agency action by the PBGC with respect to the determination which was the subject of the appeal." *Id*. § 4003.59(b). The regulations further state that "a person aggrieved by an initial determination . . . has not exhausted his or her administrative remedies until he or she has filed" such a request for review. *Id*. § 4003.7.

The pilots contend that these administrative remedies were not intended to apply to their situation. As both sides agree, to date the pilots have received only estimated determinations and have not yet received the formal "initial determination" to which the regulations refer. Because the "regulations remain silent on exhaustion of claims against PBGC for actions other than final determination of benefits," the pilots contend that the regulations "do not preclude" their claims. Reply Br. 15.

The PBGC, to whose interpretation of its own regulations we owe substantial deference, *see Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512 (1994), persuasively argues to the contrary. The Corporation insists that, although the exhaustion regulations do not mention estimated benefit determinations, they are part of a process that begins with such determinations, leads to formal determinations, and culminates in intra-agency appeals generating "final agency actions." It would make little sense, the PBGC observes, to establish an elaborate process for appealing determinations (and requiring the exhaustion of such appeals) once the Corporation reaches a formal conclusion, but

---

[6]An aggrieved person may alternatively request reconsideration by "the Director of the department within the PBGC that issued the initial determination." 29 C.F.R. § 4003.33. The filing of either an appeal or a request for reconsideration "shall automatically stay the effectiveness of a determination" until the PBGC issues a decision. *Id*. § 4003.22(a).

to allow plan participants to pretermit that process by going to court before that stage is even reached.

In any event, regardless of whether the regulations' authors consciously accounted for the possibility that a participant might want to challenge an estimated determination, there is no question that the regulations provide an administrative avenue for doing so: An estimated determination inevitably leads to a formal benefit determination, and, if the latter does not satisfy the participant, the regulations provide for an administrative appeal. If the participant wins that appeal, he or she is entitled to recoup any underpayments along the way, with interest. *See* 29 C.F.R. § 4022.81-.83; Appellee's Br. 14.

2. The Supreme Court has explained that courts generally require administrative exhaustion "because it serves the twin purposes of protecting administrative agency authority and promoting judicial efficiency." *McCarthy*, 503 U.S. at 145. With respect to agency authority, "the exhaustion doctrine recognizes . . . that agencies, not the courts, ought to have primary responsibility for the programs that Congress has charged them to administer." *Id*. The doctrine "acknowledges the commonsense notion[s] of dispute resolution that an agency ought to have an opportunity to correct its own mistakes [regarding] the programs it administers before it is haled into federal court," *id*., and that "'frequent and deliberate flouting of administrative processes' could weaken an agency's effectiveness by encouraging disregard of its procedures," *id*. (quoting *McKart v. United States*, 395 U.S. 185, 195 (1969)). With respect to judicial efficiency, by giving an agency the opportunity "to correct its own errors, a judicial controversy may well be mooted, or at least piecemeal appeals may be avoided." *Id*. "And even where a controversy survives administrative review, exhaustion of the administrative procedure may produce a useful record for subsequent judicial

consideration, especially in a complex or technical factual context." *Id.*

The purposes identified by the Court are well served by enforcing an exhaustion requirement in this case.[7] Exhaustion would protect the PBGC's authority to administer the complex program that Congress has entrusted to its care, give it the chance to correct its own mistakes, and obviate what would otherwise be an incentive to disregard -- and to disrupt -- the PBGC's administrative procedures. Indeed, allowing the pilots to proceed in court at this time would permit them to jump ahead of others who have patiently waited for the PBGC to reach final determinations -- which would no doubt encourage those others to file suit as well, disrupting the entire process and ultimately delaying determinations for everyone. Requiring exhaustion would also promote judicial efficiency by giving the PBGC the opportunity to moot this appeal by correcting the errors alleged by the pilots; it would at least require the pilots to consolidate in one appeal any objections they may have to the Corporation's final as well as estimated calculations. *See McKart*, 395 U.S. at 194 (noting that "it is generally more efficient for the administrative process to go forward without interruption than it is to permit the parties to seek aid from the courts at various intermediate stages").

---

[7]*Cf. Communications Workers*, 40 F.3d at 432 (noting that "the exhaustion requirement enables plan administrators to apply their expertise and exercise their discretion to manage the plan's funds, correct errors, make considered interpretations of plan provisions, and assemble a factual record that will assist the court reviewing the administrators' actions").

The pilots contend that the usual considerations counseling in favor of exhaustion are less applicable here because their claims -- that the PBGC has misconstrued the applicable statutes and regulations -- present pure questions of law. Since those claims do not involve factual determinations, the pilots argue, requiring exhaustion will not produce an administrative record that will be of any assistance to the court.

We disagree. The pilots concede that the PBGC's interpretations of the relevant statutory and regulatory provisions are entitled to judicial deference, and that we must uphold them if they are reasonable. *See* Reply Br. 17 ("Appellants simply request that PBGC adopt a reasonable interpretation of the statute, regulations and plan documents."); Oral Arg. Tape at 1:02:13; *see generally Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837 (1984). But in order to evaluate the reasonableness of the PBGC's constructions, we need a record explaining the reasons for those constructions. At present, we have only estimated benefit calculations, with no formal explanation of their rationale. Requiring exhaustion will generate the necessary record. *See* 29 C.F.R. § 4003.59(c) (providing that the "decision of the Appeals Board shall be in writing, specify the relief granted, if any, [and] state the bases for the decision, including a brief statement of the facts or legal conclusions supporting the decision").[8] Equally important, it will provide an authoritative statement of the agency's position by its senior officials.

An analogous situation was at issue in *Communications Workers*. *See* 40 F.3d at 433. There, former AT&T employees sued the administrators of the (ongoing) AT&T pension plan

---

[8] *See McCarthy*, 503 U.S. at 145 (recognizing that "exhaustion of the administrative procedure may produce a useful record for subsequent judicial consideration").

pursuant to ERISA, claiming that the administrators' decision deeming them ineligible for certain benefits violated (inter alia) the terms of the plan. In concluding that the plaintiffs were first required to exhaust their administrative remedies by appealing the administrators' decision to the plan's benefits committee, we relied in part on the fact that the standard of review of the administrators' construction of the plan's terms was abuse of discretion.[9] That standard made it "important for the plan to provide a final, fully considered, and reasoned explanation for the court to evaluate." *Id.* But because the "Benefits Committee . . . never rendered a final determination, and thus never provided a fully reasoned explanation for such a decision, the District Court had nothing before it, except the arguments of counsel, to which it could defer." *Id.* "By permitting appellees' ERISA claim to proceed before obtaining a final decision from the Plan, the District Court left itself unable to apply properly the . . . rule of deference." *Id.* Were we to permit the pilots' claims to proceed here, we would face a similar disability.[10]

_____

[9]We explained that "'a denial of benefits challenged under [section 502 of ERISA] is to be reviewed under a de novo standard *unless* the benefit plan gives the administrator . . . discretionary authority to determine eligibility for benefits or to construe the terms of the plan,' in which case courts apply an abuse-of-discretion standard," *Communications Workers*, 40 F.3d at 433 (quoting *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)) (emphasis added in *Communications Workers*), and that the AT&T "pension administrator ha[d] discretionary authority to construe the terms of the plan and determine eligibility," *id.*

[10]We note that, in *McKart v. United States*, the Supreme Court held that a defendant's failure to exhaust administrative remedies did not preclude him from asserting the invalidity of his Selective Service Act classification as a defense to prosecution for failing to report for induction into the armed forces. 395 U.S. at 196-201. Although there were multiple factors counseling against requiring exhaustion in that

3. Finally, the pilots point out that courts have recognized certain circumstances "in which the interests of the individual [plaintiff] weigh heavily against requiring administrative exhaustion." *McCarthy*, 503 U.S. at 146. They assert that two such circumstances are relevant here.

First, the pilots argue that they should be excused from exhausting administrative remedies because the PBGC has already predetermined the questions at issue. In particular, the pilots note, the PBGC has stated "that its position on calculating annuities for recipients of partial lump sum payments is longstanding." Appellants' Br. 34. Accordingly, an administrative appeal would be futile and should not be required. *Id.*

We reject this argument. The "'futility exception is . . . quite restricted,'" *Communications Workers*, 40 F.3d at 432 (quoting *Committee of Blind Vendors of the District of Columbia v. District of Columbia*, 28 F.3d 130, 133 n.5 (D.C. Cir. 1994)), and "has been applied only when resort to administrative remedies is 'clearly useless,'" *id.* (quoting *Randolph-Sheppard Vendors of Am. v. Weinberger*, 795 F.2d 90, 105 (D.C. Cir. 1986)). In order to come within its terms, plaintiffs "must show that it is *certain* that their claim will be

---

case, *see id.*, the Court did find persuasive the fact that the issue was "solely one of statutory interpretation," *id.* at 197-98. In that pre-*Chevron* case, however, the Court stated that "judicial review would not be significantly aided" by having the Selective Service System's interpretation of the statute because "the proper interpretation [was] certainly not a matter of [agency] discretion" to which the Court would have to defer. *Id.* at 198-99. Here, the plaintiffs concede that deference to a reasonable agency interpretation is required.

denied on appeal, not merely that they doubt an appeal will result in a different decision." *Id*. (internal quotation marks omitted). In *Communications Workers*, we rejected a similar argument contending that appeal to the pension plan's benefits committee would be futile because plan administrators had consistently interpreted the plan to deny the kinds of claims sought by plaintiffs. *See id*. at 432-33. "Even if one were to concede that an unfavorable decision from the Benefits Committee was *highly likely*," we said, "that does not satisfy our strict futility standard requiring a *certainty* of an adverse decision." *Id*. at 433.

The PBGC's actions to date belie the pilots' concerns. Even the pilots concede that the PBGC has corrected two of the four errors they initially alleged. *See supra* Part II; Appellants' Br. 2, 6-7. It is difficult to argue persuasively that appeals to the PBGC are futile when the Corporation has already reversed course and remedied half of the plaintiffs' complaints. Moreover, that reversal took place without the involvement of the PBGC Appeals Board, which -- as far as the record reflects -- has not yet taken a position on the remaining two questions of statutory and regulatory construction. Plaintiffs have thus failed to meet their heavy burden of showing that a request for relief to the Appeals Board would be futile.

Second, the pilots observe that courts do not require exhaustion of administrative remedies where "a particular plaintiff may suffer irreparable harm if unable to secure immediate judicial consideration of his claim." *McCarthy*, 503 U.S. at 147. "Each day that PBGC delays in calculating estimated benefits," the pilots contend, "results in prejudice to plaintiffs." Appellants' Br. 33. "For every month that retirees have to wait for PBGC to correct its erroneous benefit calculations, the retirees have to figure out what sacrifices in

their standard of living they must make to continue to support themselves on an unexpectedly diminished pension." *Id*. at 7.

Like the district court, we do "not doubt that the reduction of plaintiffs' benefits has caused them financial hardship, particularly in light of the fact that the plaintiffs are all retirees." *Boivin*, 297 F. Supp. 2d at 118. But we cannot conclude that such a temporary (if later proven erroneous) reduction warrants exemption from the generally applicable requirement of exhaustion. It certainly does not constitute "irreparable harm," *McCarthy*, 503 U.S. at 147, since the PBGC's regulations provide that, if it is subsequently determined that a beneficiary in a terminated plan has been underpaid, the beneficiary will receive reimbursement of the underpaid amount, plus interest, *see* 29 C.F.R. § 4022.81-.83; Appellee's Br. 14.

We stress that this resolution does not sentence the plaintiffs to an interminable wait for their final benefit determinations. As the Court warned in *McCarthy*, exhaustion may be excused where "prejudice . . . result[s] . . . from an unreasonable or indefinite timeframe for administrative action." 503 U.S. at 147. And the PBGC itself concedes that, if it takes too long to make a final determination, the plaintiffs may bring suit under the Administrative Procedure Act to "compel agency action unlawfully withheld or unreasonably delayed." 5 U.S.C. § 706(1); *see* Appellee's Br. 16; Oral Arg. Tape at 52:32.

We have not, however, reached that point. The PBGC's stated goal is to issue benefit determinations within three years of a plan's termination date. *See* Campbell Decl. ¶ 15. Although it has not achieved that goal in this case, the PBGC represented at oral argument that it expected to come close to the three-year mark by completing the pilots' final benefit determinations within the next few months. *See* Oral Arg. Tape at 49:29. We have no reason to doubt that representation. That

said, if the PBGC fails to complete the formal benefit determinations within a reasonable time period, the appellants may bring suit under the Administrative Procedure Act to compel agency action. *See Telecommunications Research & Action Ctr. v. FCC*, 750 F.2d 70 (D.C. Cir. 1984); *see also McCarthy*, 503 U.S. at 147 (noting that a "claimant 'is not required indefinitely to await a decision of [an administrative] tribunal before applying to a federal court for equitable relief'" (quoting *Smith v. Illinois Bell Tel. Co.*, 270 U.S. 587, 591-92 (1926)).

4. In sum, we conclude that the plaintiffs' claims against the PBGC must be dismissed because they have failed to exhaust their administrative remedies. Our ruling is limited to the facts of this case: a challenge to benefit calculations, where the dispute is over the meaning of statutory and regulatory terms, and where the construction of those terms has not yet been definitively established by either the courts or the PBGC. Under these circumstances, we hold that plaintiffs must exhaust administrative remedies before they may seek judicial intervention.

IV

The district court's grant of partial summary judgment for the PBGC is vacated, and the case is remanded to that court with instructions to dismiss the pilots' claims against the PBGC, without prejudice, for failure to exhaust administrative remedies.

*So ordered*.