# United States Court of Appeals for the Federal Circuit

2007-1011

AGRO DUTCH INDUSTRIES LIMITED,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

COALITION FOR FAIR PRESERVED MUSHROOM TRADE,

Defendant-Appellee.

Lizbeth R. Levinson, Garvey Schubert Barer, of Washington, DC, argued for plaintiff-appellant. With her on the brief was Ronald M. Wisla.

Claudia Burke, Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellee, United States. On the brief were Peter D. Keisler, Acting Attorney General, Jeanne E. Davidson, Director, Patricia M. McCarthy, Assistant Director, and Richard P. Schroeder, Attorney. Of counsel on the brief was Matthew D. Walden, Attorney, Office of the Chief Counsel for Import Administration, United States Department of Commerce, of Washington, DC.

Michael J. Coursey and Adam H. Gordon, Kelley, Drye, Collier, Shannon, LLP, of Washington, DC, for defendant-appellee, Coalition for Fair Preserved Mushroom Trade.

Appealed from: United States Court of International Trade

Senior Judge R. Kenton Musgrave

# United States Court of Appeals for the Federal Circuit

2007-1011

AGRO DUTCH INDUSTRIES LIMITED,

Plaintiff-Appellant,

v.

UNITED STATES,

Defendant-Appellee,

and

COALITION FOR FAIR PRESERVED MUSHROOM TRADE,

Defendant-Appellee.

_____

DECIDED:  November 20, 2007

_____

Before MICHEL, Chief Judge, MOORE, Circuit Judge, and COTE, District Judge.[*]

COTE, District Judge.

Plaintiff Agro Dutch Industries Limited ("Agro") appeals from a decision of the United States Court of International Trade affirming the Department of Commerce's ("Commerce") finding of duty absorption during the fourth administrative review of an antidumping duty order governing the importation of certain preserved mushrooms from India. Agro Dutch Indus., Ltd. v. United States, No. 04-493, 2006 WL 785463 (Ct. Int'l Trade Mar. 28, 2006).  Agro contends that Commerce did not have authority to make

_____

[*]	Honorable Denise Cote, District Judge, United States District Court for the Southern District of New York, sitting by designation.

such a finding because Agro did not sell merchandise subject to the antidumping order "through an importer who is affiliated with" Agro, as required by 19 U.S.C. § 1675(a)(4), but rather acted as its own importer of record for the relevant sales. Commerce counters by arguing that (1) Agro failed to exhaust its remedies on this issue because it did not raise this argument during the proceedings before Commerce, and (2) where a foreign producer or exporter acts as its own importer of record, it is "affiliated" with itself within the meaning of § 1675(a)(4). The court below held that Agro's appeal on this subject presented a "pure question of law" that could be heard on the merits despite Agro's failure to exhaust, but affirmed Commerce's interpretation of § 1675(a)(4) and its finding of duty absorption. Agro Dutch, 2006 WL 785463, at *10-14. Agro appeals the latter ruling, and we reverse.

BACKGROUND

The following facts are not disputed. Agro is a producer and exporter of certain preserved mushrooms subject to an antidumping order issued on February 19, 1999. Notice of Amendment of Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order: Certain Preserved Mushrooms From India, 64 Fed. Reg. 8311 (Feb. 19, 1999) ("Antidumping Order"). On February 3, 2003, Commerce published a notice of opportunity to request an annual administrative review of the Antidumping Order. Antidumping or Countervailing Duty Order, Finding, or Suspended Investigation; Opportunity To Request Administrative Review, 68 Fed. Reg. 5272 (Feb. 3, 2003). By a letter dated February 28, 2003, defendant Coalition for Fair Preserved Mushroom Trade ("Coalition") requested, pursuant to 19 C.F.R. § 351.213, that Commerce conduct an annual review of the Antidumping Order at issue here, and further requested, pursuant

to 19 C.F.R. § 351.213(j), that Commerce determine whether antidumping duties had been absorbed by Agro and several other companies subject to the Antidumping Order.

On March 25, 2003, Commerce initiated the fourth administrative review of the Antidumping Order. Initiation of Antidumping and Countervailing Duty Administrative Reviews, 68 Fed. Reg. 14,394 (Mar. 25, 2003). This review covered the period between February 1, 2002 and January 31, 2003 (the "POR"). On September 25, 2003, Commerce stated in a memorandum placed in the administrative record that, although it had initially determined that it would not conduct a duty absorption analysis in connection with the annual review because Agro (and several other companies subject to the Antidumping Order) made only export price sales to the United States,[1] it now concluded that because "they also act as importer of record for certain . . . of their U.S. sales . . . it is appropriate to conduct a duty absorption analysis with respect to these respondents in accordance with our past practice."

Commerce notified Agro of this determination in a letter of September 30, 2003. In this letter, Commerce provided Agro an opportunity to place into the record, no later than January 9, 2004, proof that unaffiliated purchasers will ultimately pay the antidumping duties assessed during the POR on those sales for which Agro acted as the importer of record, and warned that Commerce would deem duty absorption to have occurred in the absence of such proof. Agro did not respond to the letter.

On March 8, 2004, Commerce published the preliminary results of the fourth administrative review. Certain Preserved Mushrooms from India: Preliminary Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 10,659 (Mar. 8, 2004)

---

[1] See 19 U.S.C. § 1677a(a). The relationship between this provision and § 1675(a)(4) will be addressed below.

("Preliminary Results"). In the Preliminary Results, Commerce reiterated the rationale offered in the September 25 memorandum for conducting a duty absorption inquiry under the facts presented here, with the addition of a citation to section 751(a)(4) of the Tariff Act of 1930 (codified at 19 U.S.C. § 1675(a)(4)). Id. at 10,661. After noting Agro's failure to provide any evidence in response to the letter of September 30, Commerce preliminarily found that Agro had absorbed antidumping duties during the POR on those sales for which it was the importer of record. Id.

In response to the Preliminary Results, Agro submitted a case brief on June 10, 2004, challenging, inter alia, Commerce's duty absorption finding. At this stage, Agro's sole contention was that there was evidence in the record that Agro's customers often pay the antidumping duty directly to the Customs Service, even though Agro is the importer of record, and thus duty absorption did not take place during the POR. Finding this submission both untimely and insufficient, Commerce confirmed its preliminary duty absorption finding on August 20, 2004. Certain Preserved Mushrooms From India: Final Results of Antidumping Duty Administrative Review, 69 Fed. Reg. 51,630, 51,631 (Aug. 20, 2004) ("Final Results").

Agro filed an appeal with the Court of International Trade on October 1, 2004, challenging Commerce's duty absorption finding, along with several other findings made in the Final Results. The Court of International Trade affirmed Commerce's absorption determination on the grounds noted above. Agro Dutch, 2006 WL 785463, at *10-14. This appeal followed. We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(5).

DISCUSSION

The purpose of the antidumping statute is to prevent foreign goods from being sold at unfairly low prices in the United States to the injury of existing or potential United States producers. FAG Italia, S.p.A. v. United States, 291 F.3d 806, 808-09 (Fed. Cir. 2002). To that end, if Commerce and the International Trade Commission ("ITC") determine that a foreign exporter or producer has been or is likely to be selling goods in the United States at less than fair value to the detriment of United States producers, Commerce will issue an antidumping order assessing duties on that foreign exporter or producer. See 19 U.S.C. §§ 1673-1673d.

Once an antidumping order has been issued, the statute requires that the order be periodically reviewed. First, if requested, Commerce will review the order annually to update the applicable duty. Id. § 1675(a)(1)(B). This is referred to as the "annual review." Second, the order is automatically terminated after five years unless, upon review in accordance with the procedures established under 19 U.S.C. § 1675a, Commerce determines that revocation of the duty "would be likely to lead to continuation or recurrence of dumping," and the ITC determines that revocation "would be likely to lead to . . . material injury" to the relevant United States industry. Id. § 1675(c)(1). This is referred to as the "sunset review." Third, during the second or fourth annual review after the publication of an antidumping order, Commerce, "if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States through an importer who is affiliated with such foreign producer or exporter." Id. § 1675(a)(4). This is referred to as the "duty absorption inquiry."

As we have previously noted, "[t]he purpose of a duty absorption inquiry is to ensure that foreign exporters [subject to antidumping orders] do not undermine the purpose of the antidumping laws by 'absorbing' the duty rather than passing the duty on to United States purchasers in the form of higher prices." FAG Italia, 291 F.3d at 809. A finding of duty absorption during the second or fourth annual review does not affect the duty imposed as a result of such review. See Uruguay Round Agreements Act: Statement of Administrative Action ("SAA"), H.R. Doc. No. 103-316, at 885 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4210. Rather, Commerce reports the findings made during the absorption inquiry to the ITC for consideration during the sunset review. 19 U.S.C. § 1675(a)(4); see also id. § 1675a(a)(1)(D) (requiring ITC to consider the results of the duty absorption review during the sunset review). Thus, "[t]he consequence of a finding of duty absorption by Commerce is that the anti-dumping order is less likely to be revoked as a result of a sunset review," as such a finding indicates that the foreign "'producer or exporter would be able to market more aggressively should the order by revoked as a result of a sunset review.'" FAG Italia, 291 F.3d at 810 (quoting SAA at 886, reprinted in 1994 U.S.C.C.A.N. at 4211). This appeal concerns Commerce's authority to conduct a duty absorption inquiry under § 1675(a)(4) during the second or fourth annual review when a foreign exporter or producer acts as its own importer of record.

I

Agro's sole contention on appeal is that Commerce was not empowered to conduct a duty absorption inquiry during the fourth annual review of the Antidumping Order because Agro did not sell its merchandise "in the United States through an

importer who is affiliated" with Agro, as required by § 1675(a)(4), but rather acted as its own importer of record for the relevant sales during the POR.[2]  Before discussing the merits of this challenge, however, we must first determine whether Agro's appeal should be dismissed on exhaustion grounds.

It is undisputed that Agro failed to raise the argument that forms the basis for the instant appeal during the proceedings before Commerce.  The court below nevertheless held that "[t]o the extent Agro Dutch's argument implicates a pure question of law, it may be addressed" on appeal.  In the circumstances presented here, we find that the court below did not abuse its discretion in reaching this conclusion.

As we recently reaffirmed, the application of "exhaustion principles in trade cases is subject to the discretion of the judge of the Court of International Trade." Corus Staal BV v. United States, No. 06-1652, 2007 WL 2741470, at *9 (Fed. Cir. Sept. 21, 2007); see also 28 U.S.C. § 2637(d).  In the exercise of this discretion, the Court of International Trade has developed and refined a "pure legal question" exception to the exhaustion requirement in trade cases.  See Consol. Bearings Co. v. United States, 166 F. Supp. 2d 580, 587 (Ct. Int'l Trade 2001) (collecting cases), rev'd 348 F.3d 997, 1003 (Fed. Cir. 2003).[3]  Without passing upon the precise contours of that doctrine as articulated by the Court of International Trade or minimizing the importance of the exhaustion requirement, see Corus Staal, 2007 WL 2741470, at *7-8, we conclude that

---

[2]  Commerce's duty absorption finding was made only with respect to those sales for which Agro acted as the importer of record. Final Results, 69 Fed. Reg. at 51,631.  Thus, these are the only sales relevant here.

[3]  On appeal in Consolidated Bearings, we concluded that additional development of the factual record, rather than "[s]tatutory construction alone," was necessary to address adequately the plaintiff's claims, and thus held that it was not appropriate to apply the "pure legal question" exception in that case.  348 F.3d at 1003.

the court below did not abuse its discretion in finding that Agro's argument regarding the proper interpretation of § 1675(a)(4) presents a "pure question of law" that can be addressed on appeal despite Agro's failure to raise such an argument in the proceedings before Commerce. Unlike Consolidated Bearings, "[s]tatutory construction alone" is sufficient to resolve the merits of the argument raised by Agro here, 348 F.3d at 1003, as Agro has now abandoned the evidentiary arguments raised in its case brief before Commerce regarding the duty absorption issue. Thus, we will proceed to address the merits of Agro's claim.[4]

II

We review de novo whether Commerce's interpretation of a governing statutory provision is in accordance with law, but we do so within the framework established by Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). See, e.g., Elkem Metals Co. v. United States, 468 F.3d 795, 800 (Fed. Cir. 2006). Under Chevron, "a reviewing court must first ask 'whether Congress has directly spoken to the precise question at issue.'" FDA v. Brown & Williamson Tobacco Corp., 529 U.S. 120, 132 (2000) (quoting Chevron, 467 U.S. at 842). "If Congress has done so, the

---

[4]    Citing Biovin v. U.S. Airways, Inc., 446 F.3d 148, 156 (D.C. Cir. 2006), Commerce argues that this exception cannot be applied because Commerce's interpretations of the antidumping statute are entitled to deference, and that without additional development of the record in this case, such deference cannot properly be accorded. It is well established that "statutory interpretations articulated by Commerce during its antidumping proceedings are entitled to judicial deference under Chevron." Pesquera Mares Australes Ltda. v. United States, 266 F.3d 1372, 1382 (Fed. Cir. 2001). Commerce has not persuasively articulated, however, how additional proceedings would further develop the interpretation offered here. During the conduct of the annual review -- for example, in the letter of September 30, 2003 and in the Preliminary Results -- and on appeal both below and before this Court, Commerce has had an opportunity to articulate and defend its interpretation of the statute. That interpretation will be accorded the appropriate deference under Chevron.

inquiry is at an end; the court 'must give effect to the unambiguously expressed intent of Congress.'" Id. (quoting Chevron, 467 U.S. at 843). It is only "[i]n the absence of clear direction from the statute," that we will then proceed to "ask whether there is ambiguous statutory language that might authorize the agency to fill a statutory gap," and, in turn, "whether Commerce's interpretation of ambiguous statutory language is based on a permissible interpretation of the statute." FAG Italia, 291 F.3d at 815. As the Supreme Court has made clear, however, "an agency's interpretation of a statute is not entitled to deference when it goes beyond the meaning that the statute can bear." MCI Telecomm. v. AT&T Co., 512 U.S. 218, 229 (1994).

The dispute between the parties focuses on the first sentence of 19 U.S.C. § 1675(a)(4). That sentence reads, in full:

> During any review under this subsection initiated 2 years or 4 years after the publication of an antidumping duty order under section 1673e(a) of this title, the administering authority, if requested, shall determine whether antidumping duties have been absorbed by a foreign producer or exporter subject to the order if the subject merchandise is sold in the United States <u>through an importer who is affiliated with such foreign producer or exporter</u>.

19 U.S.C. § 1675(a)(4) (emphasis added). It is not contested that the review at issue here was "initiated . . . 4 years after the publication of" the Antidumping Order, or that a "request[]" was made by the Coalition that Commerce conduct a duty absorption inquiry. The only question that must be resolved here is whether Agro sold its merchandise through an "affiliated" importer when it acted as its own importer of record -- i.e., whether Agro can be "affiliated" with itself.

In seeking the unambiguous meaning of this language, we begin with the statute's definition of the term "affiliated." See Crawfish Processors Alliance v. United States, 477 F.3d 1375, 1379 (Fed. Cir. 2007). 19 U.S.C. § 1677(33) states:

> The following persons shall be considered to be "affiliated" or "affiliated persons":
>
> > (A) Members of a family, including brothers and sisters (whether by the whole or half blood), spouse, ancestors, and lineal descendants.
> >
> > (B) Any officer or director of an organization and such organization.
> >
> > (C) Partners.
> >
> > (D) Employer and employee.
> >
> > (E) Any person directly or indirectly owning, controlling, or holding with power to vote, 5 percent or more of the outstanding voting stock or shares of any organization and such organization.
> >
> > (F) Two or more persons directly or indirectly controlling, controlled by, or under common control with, any person.
> >
> > (G) Any person who controls any other person and such other person.
>
> For purposes of this paragraph, a person shall be considered to control another person if the person is legally or operationally in a position to exercise restraint or direction over the other person.[5]

Commerce does not claim that one of the above-listed definitions conclusively demonstrates that a single person or entity that plays two discrete roles during the dumping process -- e.g., acting both as exporter and importer, as Agro did here -- can

---

[5] Although § 1677(33) speaks of "persons," this definition governs the standard for affiliation between corporate entities as well. See Crawfish Processors Alliance, 477 F.3d at 1378-82; see also 1 U.S.C. § 1 ("In determining the meaning of any Act of Congress, unless the context indicates otherwise . . . the words 'person' and 'whoever' include corporations, companies, associations, firms, partnerships, societies, and joint stock companies, as well as individuals.")

be considered "affiliated" with itself.  Commerce instead argues that § 1677(33) generally, and § 1677(33)(G) in particular, establishes that affiliation exists where there is a "control relationship," and because "an entity may control itself," an entity can also be considered as "affiliated" with itself.  Agro counters that the definition provided in § 1677(33) makes plain that affiliation requires a minimum of two entities, as each of the scenarios listed in that section makes reference to two or more persons or organizations.

Commerce's reading of § 1677(33) -- and, by extension, § 1675(a)(4) -- fails to convince us that the term "affiliated" is sufficiently ambiguous to permit us to proceed to the second step of the Chevron analysis, particularly as we find that Agro's less-tortured interpretation comports with both the ordinary usage of the term "affiliated" and the use of that term elsewhere in the antidumping statute.  First, Agro's view that "affiliation" requires the presence of two or more entities is consistent with the ordinary usage of the word as evidenced by standard dictionary definitions of "affiliate" (as a noun and verb) and "affiliated."  "In order to ascertain the established meaning of a term . . . , it is appropriate to consult dictionaries." Pesquera Mares, 266 F.3d at 1382 (internal quotation marks and citation omitted); see also MCI Telecomm., 512 U.S. at 225.  Every dictionary we have consulted defines these words such that the concept of a person or organization affiliating with itself is excluded or, at the very least, highly implausible.  For example, the Oxford English Dictionary (2d ed. 1991), defines "affiliated" as "[a]dopted as a child or fixed in paternity.  Usually fig[urative].  United in a dependent relation, as the branches of a society to the central organization." Id. at 217.  Echoing the definition of "affiliated" given in § 1677(33), Black's Law Dictionary (7th ed. 1999), defines the

noun "affiliate" as "[a] corporation that is related to <u>another corporation</u> by shareholdings or other means of control; a subsidiary, parent, or sibling corporation." <u>Id.</u> at 59 (emphasis added). <u>See also</u> <u>Webster's Third New International Dictionary</u> 35 (1993) (defining the verb "affiliate" primarily as "to attach as a member or branch"). Each of these definitions, in turn, draws on the Latin antecedents of the term "affiliate" or "affiliated," namely, <u>filius</u>, meaning "son," and <u>affiliare</u>, meaning "to adopt as a son." <u>See, e.g.</u>, <u>id.</u>; <u>see also</u> <u>Oxford Latin Dictionary</u> 701 (1996); <u>cf.</u> <u>MCI Telecomm.</u>, 512 U.S. at 225 (examining the Latin root of the word "modify"). As these roots make clear, if we use the word "affiliate" in its ordinary sense, an organization can no more affiliate with itself than a man can adopt himself as his own son. In short, the ordinary definition of "affiliated" cannot be stretched to accommodate Commerce's interpretation of that term as used in § 1675(a)(4), and "[w]e find nothing in the statute to suggest that Congress intended to depart from the ordinary definition" of that term. <u>Pesquera Mares</u>, 266 F.3d at 1383.

Second, as the Supreme Court has instructed, a "term should be construed, if possible, to give it a consistent meaning throughout" a particular statute. <u>Gustafson v. Alloyd Co.</u>, 513 U.S. 561, 568 (1995). Commerce's interpretation of "affiliation," however, is demonstrably at odds with the use of that term elsewhere in the antidumping laws, including in a provision governing another aspect of the dispute between Commerce and Agro. The parties have disputed whether the fact that Agro was determined to have made "export price" ("EP") sales rather than "constructed export price" ("CEP") sales within the meaning of 19 U.S.C. § 1677a during the POR indicates an admission by Commerce that Agro did not makes sales through an

"affiliated" importer. It is not necessary for us to reach the question of whether a determination that an entity made EP or CEP sales -- which is made while calculating the antidumping duty, see id. § 1673 -- should govern whether an absorption inquiry can be conducted under § 1675(a)(4). We nevertheless note that the phrase "affiliated" is used in § 1677a(b) in such a way that, were Commerce's proposed definition applied consistently throughout the statute, subsections (a) and (b) of § 1677a would collapse together. As discussed at greater length in our decision in AK Steel Corp. v. United States, 226 F.3d 1361 (Fed. Cir. 2000), subsections (a) and (b) of § 1677a define EP and CEP such that "while a sale made by a producer or exporter could be either EP or CEP, one made by a U.S. affiliate can only be CEP." Id. at 1371.[6] If a foreign exporter or producer can be "affiliated" with itself, however, the statute's distinction between the two categories of sales would be eliminated. Following both the "normal rule of statutory construction that identical words used in different parts of the same act are intended to have the same meaning," Gustafson, 513 U.S. at 570 (internal quotation marks and citation omitted), and the "cardinal principle of statutory construction that a statute ought . . . to be so construed that . . . no clause, sentence, or word shall be superfluous," TRW Inc. v. Andrews, 534 U.S. 19, 31 (2001) (internal quotation marks

---

[6] Subject to certain adjustments under later subsections, 19 U.S.C. § 1677a(a) defines EP as "the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States." Section 1677a(b) defines CEP as "the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter."

and citation omitted), Commerce's interpretation of the word "affiliated" in § 1675(a)(4) cannot be sanctioned here.

In sum, Agro's interpretation of "affiliated" in § 1675(a)(4) is consistent with the definition of "affiliated" given in § 1677(33), as well as with the use of that term in both common parlance and elsewhere in the antidumping statute, whereas Commerce's proposed reading is in conflict with each of these guideposts to statutory interpretation. In these circumstances, we must find that the term "affiliated" in § 1675(a)(4) "'has a plain and unambiguous meaning with regard to the particular dispute in [this] case,'" and our inquiry is thus at an end. Crawfish Processors Alliance, 477 F.3d at 1379 (quoting Robinson v. Shell Oil Co., 519 U.S. 337, 340 (1997)). We therefore hold that Commerce was not empowered to conduct a duty absorption inquiry under § 1675(a)(4) with respect to the sales made by Agro on which it acted as the importer of record, because such sales were not made by Agro "through an importer who is affiliated with" Agro.

In reaching this conclusion we recognize, as we did in FAG Italia, that "'[a]n affirmative finding of absorption in an [absorption inquiry under § 1675(a)(4)] is intended to have a deterrent effect on continued absorption of duties by affiliated importers.'" 291 F.3d at 810 (quoting SAA at 885-86, reprinted in 1994 U.S.C.C.A.N. at 4120). As we noted in that case, however, "[w]e cannot speculate that conducting two and four year [absorption] reviews would serve Congress's purpose when Congress did not authorize such reviews" in this circumstance. Id. at 817. When Congress has spoken clearly, through the use of "unambiguous words such as 'affiliated,'" neither Commerce nor this Court is "permitted to substitute [its] own definition for that of Congress, regardless of

how close the substitute definition may come to achieving the same result as the statutory definition, or perhaps a result that is arguably better." AK Steel Corp., 226 F.3d at 1371, 1372. Put differently, while Congress may not have affirmatively intended to bar Commerce from conducting a duty absorption inquiry under the facts presented here, Congress also did not authorize Commerce to do so, and under settled principles of statutory construction, the effect is the same, as "an agency literally has no power to act . . . unless and until Congress confers power upon it." La. Pub. Serv. Comm'n v. FCC, 476 U.S. 355, 374 (1986).

We also note that our holding that an absorption review is not authorized by § 1675(a)(4) at the second or fourth annual review where the foreign exporter or producer acts as the importer of record is not tantamount to a finding that Commerce is never permitted to consider whether such a foreign exporter or producer has absorbed duties on those sales. While we have held that "the statutory provisions governing annual reviews for Commerce do not confer general authority that might include the power to consider duty absorption," FAG Italia, 291 F.3d at 814, we reiterate that the sunset review under § 1675(c)(1) requires Commerce to determine whether "revocation of the . . . antidumping duty order . . . would be likely to lead to continuation or recurrence of dumping," and that this provision may well "authorize[] Commerce to consider absorption [during the sunset review], even though section 1675(a)(4) deals explicitly with that subject." Id. at 819. Indeed, under § 1675a(c)(2), "[i]f good cause is shown," Commerce is authorized to "consider such other price, cost, market, or economic factors as it deems relevant" during the sunset review.

In sum, then, our holding today that Commerce was not authorized to conduct an absorption inquiry as part of the fourth annual review of the Antidumping Order at issue here cannot be read to permit Agro, or other foreign producers or exporters who act as their own importers of record, to obtain an unjustified benefit or to undermine the enforcement mechanisms of the antidumping laws. We therefore decline to depart from the conclusion required by the plain meaning of the statute.

## CONCLUSION

We reverse the judgment of the Court of International Trade holding that Commerce possessed the authority under 19 U.S.C. § 1675(a)(4) to conduct a duty absorption inquiry during the fourth annual review of the Antidumping Order as applied to Agro, and remand for the entry of an order directing Commerce to annul all findings and conclusions made pursuant to the duty absorption inquiry at issue here.

## REVERSED and REMANDED.

## COSTS

No costs.